# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                        No. CR 04-2040 JB

LOUIS ANTHONY DAPRANO, a.k.a.
LOUIS ANTHONY GRAVINA

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant Louis Anthony Daprano's Motion to Suppress, filed February 18, 2005 (Doc. 20)("Suppression Motion"); (ii) Defendant's Amended Motion to Suppress, filed April 6, 2005 (Doc. 37)("Amended Suppression Motion"); and (iii) Defendant's Additional Motion to Suppress the Evidence of an Arrest Warrant Executed in the State of New York Against the Defendant, Louis Daprano, filed May 24, 2005 (Doc. 53)("Additional Suppression Motion"). The Court held evidentiary hearings on these motions on May 25, 2005; July 5, 2005; December 14, 2005; and February 9, 2006. The primary issue is whether, given that New York and New Mexico police illegally seized certain materials, the Court should suppress numerous other documents obtained from the New Mexico Educators Federal Credit Union ("NMEFCU") and the Albuquerque Family Child Guidance Center ("AFCGC"), pursuant to <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), as "fruit of the poisonous tree." Because the Court finds that the independent source and inevitable discovery exceptions to the exclusionary rule apply to the documents in question, the Court will deny Daprano's suppression motions.

# FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

### A. Events Leading Up to the June 11, 2004 Search Warrant for Daprano's Residence, 1120 Summit Drive, N.E., Albuquerque, New Mexico.

1. Daprano was charged with Criminal Sexual Contact of a Minor, Third Degree, in violation of N.M. Stat. § 30-9-13A, on March 27, 2003, in the Thirteenth Judicial District of New Mexico. See Evidentiary Hearing Exhibit ("EHE") 1, State of New Mexico Incident Report, dated July 3, 2001; EHE 2, Affidavit for Arrest Warrant, dated July 6, 2001.

2. The Honorable Louis P. McDonald, District Judge for the Thirteenth Judicial District of New Mexico, issued orders setting Daprano's conditions of release on April 24, 2003. See EHE 4, Arraignment and Order Setting Conditions of Release, filed April 24, 2003; EHE 5, Conditions of Release Order, filed September 15, 2003; EHE 3, Order Setting Conditions of Release, filed January 14, 2004. In the January 14, 2004 order, the conditions were: Daprano will not leave Sandoval

County without state court permission; Daprano will keep his attorney informed of his whereabouts and of any changes in address; Daprano's attorney will notify the court if Daprano is not at his normal address and has absconded; Daprano will not have contact with the alleged victim or any unsupervised contact with anyone less than eighteen years of age; and Daprano will not use drugs or alcohol, and will not possess firearms.  See EHE 3, Order Setting Conditions of Release, filed January 14, 2004.

3.      The January 14, 2004 Order Setting Conditions of Release also stated that: "The Court may at any time modify or revoke the conditions of release imposed by this order."  Id.

4.      On May 18, 2004, before a state court hearing on Daprano's Motion to Dismiss, Daprano handed an unsigned fraudulent letter, dated May 7, 2004, purportedly from Allan Stanley, the Chairman of the Colorado Board of Parole, to his attorney, Mr. Arthur Hernandez.  See EHE 11, Fraudulent Letter from Allan Stanley to Arthur Hernandez, dated May 7, 2004.  Mr. Hernandez later received the same letter, which Allen Stanley purportedly signed, through the mail.  See Hearing Transcript at 91:9-12 (Hernandez)(taken May 25, 2005)("May 25 Transcript").

5.      The fraudulent May 7, 2004 letter states that the Colorado charges assigned to Daprano were, in actuality, those of a relative who used Daprano's name, date of birth, and social security number to keep his own record clear.  See EHE 11, Fraudulent Letter from Allan Stanley to Arthur Hernandez at 1, dated May 7, 2004.  The letter also states that the relative marred Daprano's credit rating by taking out loans with Daprano's information and defaulting on them.  See id.  Further, the letter states that the Colorado Department of Corrections verified Daprano's education, degrees, and professional experience, finding that he does have a valid doctorate in clinical psychology along with other degrees and certifications.  See id.

6.     Mr. Hernandez made copies of the fraudulent letter to give to the prosecution and to the state court, and intended to introduce it at a May 18, 2005 hearing to bolster Daprano's argument.  See May 25 Transcript at 92:6-11 (Hernandez).

7.     Mr. Hernandez gave a copy of the fraudulent letter to Thirteenth Judicial District Assistant District Attorney Cheryl Johnston before the May 18, 2005 hearing.  See May 25 at 12:13-16 (Johnston).  Ms. Johnston was concerned about the letter's authenticity and moved for a continuance, which was granted, so that the letter could be verified.  See id. at 13:22-14:20 (Johnston).

8.     Stanley informed Mr. Hernandez via letter, dated May 27, 2004, that the May 7, 2004 letter, purportedly sent from and signed by him, was a forgery.  See EHE 12, Letter from Alan Stanley to Arthur Hernandez, dated May 27, 2004.

9.     Ms. Johnston also contacted the Colorado Attorney General's Office regarding the May 7, 2004 letter.  See May 25 Transcript at 14:21-24 (Johnston).  She received both verbal and written confirmation, from Don Quick, with the Colorado Attorney General's Office, and from Stanley, that the letter was fraudulent and forged.  See id. at 14:23-15:6 (Johnston). Additionally, Deb Paulsen from the Colorado Department of Corrections informed Ms. Johnston that Daprano was living at 1120 Summit Drive, N.E., Albuquerque, New Mexico, and was using the alias Louis Anthony Gravina.  See id. at 35:7-20 (Johnston).

10.     On July 31, 2002, Jesus Sandoval, who was then an investigator for the Thirteenth Judicial District Attorney's Office, conducted a Rocky Mountain Information Network ("RMIN") search, which showed that Daprano used the alias Louis A. Gravina.  See EHE 18, RMIN Display for Louis A. Daprano, dated July 31, 2002; Hearing Transcript at 23:8-24:16 (taken December 14,

2005)(Nunez)("December 14 Transcript").[1]

11.     The Thirteenth Judicial District Attorney's Office knew that Daprano and Gravina were the same person before June 11, 2004.  See May 25 Transcript at 35:7-20 (Johnston); December 14 Transcript at 23:8-24:16 (Nunez).

12.     Rio Rancho Department of Public Safety Detective John Ross, after speaking with Ms. Johnston on June 8 or June 9, 2004, initiated an investigation concerning the authenticity of the May 7, 2004 letter.  See Hearing Transcript at 107:25-108:109:23 (Ross)(taken July 5, 2005)("July 5 Transcript").[2]

13.     On June 9, 2004, Mr. Hernandez spoke to Ms. Johnston about Daprano's conditions of release and the fraudulent letter.  See May 25 Transcript at 51:18-53:20 (Johnston).   Mr. Hernandez, in an effort to avoid revocation of Daprano's conditions of release by demonstrating that he was still in contact with Daprano, advised Ms. Johnston that he would be meeting with Daprano on June 11, 2004.  See May 25 Transcript at 101:9-18 (Hernandez).

14.     On June 10, 2004, based on the fraudulent letter that Daprano had given Hernandez, Ross drafted an affidavit in support of a search of Daprano's residence, 1120 Summit Drive, N.E., Albuquerque, New Mexico.  See EHE 13, Affidavit for Search Warrant & Search Warrant, dated June 10, 2004.  That same day, Ross took the affidavit to Judge McDonald, who reviewed it and signed the warrant.  See id.; July 5 Transcript 112:15-113:23 (Ross).

---

[1] The Court's citations to the transcript of the December 14, 2005 hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[2] The Court's citations to the transcript of the July 5, 2005 hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

15.     The affidavit for the search warrant did not specify a nexus between the address listed, 1120 Summit Drive, and the crime to be investigated.  See EHE 13, Affidavit for Search Warrant & Search Warrant, dated June 10, 2004.

**B.      The Events of June 11-15, 2004 and the Search Warrant for Daprano's Residence, 1120 Summit Drive, N.E., Albuquerque, New Mexico.**

16.     On Friday, June 11, 2004, at Mr. Hernandez' office, Mr. Hernandez informed Daprano that he was going to withdraw as his attorney, because the fraudulent letter had placed him in a compromising position.  See May 25 Transcript at 100:16-101:8 (Hernandez).

17.     At the direction of Ms. Johnston, Felix Nunez, an investigator from the Thirteenth Judicial District, was conducting surveillance on Mr. Hernandez' office on June 11, 2004.  See December 14 Transcript at 24:17-25:11 (Nunez).   Nunez witnessed Daprano enter a black Volkswagen Jetta, New Mexico license plate number GGK 891, in the parking lot of Mr. Hernandez' office.  See id. at 50:10-14 (Nunez).  Nunez telephoned Ross and provided him with the license plate number.  See id. at 44:15-45:16 (Nunez).

18.     Ross checked the license plate number and learned that it was registered to Louis A. Gravina, 1120 Summit Drive, N.E., Albuquerque, New Mexico, and that the NMEFCU held a lien on the vehicle.  See July 5 Transcript at 116:11-117:1 (Ross).  Ross verified that information with Barbara Alarid, the Director of Motor Vehicles for the City of Rio Rancho.  See July 5 Transcript at 117:6-119:4 (Ross); July 5 Transcript at 90:21-25 (Alarid); EHE 24A, Motor Vehicle Division Owner Information, dated April 5, 2005; EHE 24B, Motor Vehicle Division Lien Holder Form, dated April 5, 2005; EHE 24C, Motor Vehicle Division Information Request, dated June 11, 2004.

19.     After obtaining the information concerning the Jetta that Nunez had seen Daprano

enter, Ross, with Nunez present, executed the search warrant on 1120 Summit Drive, at approximately 11:00 a.m.  See July 7 Transcript at 120:11-121:22 (Ross).

20.     The mailbox in front of the residence at 1120 Summit Drive had the name "Gravina" on it, as well as the names Judy and Keith Bierbaum, and Gregory Hollick.  See id. at 123:6-13 (Ross); EHE 25, Photograph of Mailbox at 1120 Summit Drive.

21.     Ross telephoned Daprano and asked Daprano if he would meet him and Nunez at 1120 Summit Drive regarding the fraudulent letter.  See July 5 Transcript at 160:12-161:21 (Ross). Daprano stated that he would not meet Ross and Nunez; Daprano also refused to confirm his address. See id.

22.     Marion Sheppard, the sister of the owner of the residence at 1120 Summit Drive, arrived at 1120 Summit Drive on June 11, 2004, spoke with officer Ross, and unlocked the residence so that the warrant could be executed.  See id. at 124:7-125:1 (Ross).

23.     Sheppard told the officers that Daprano rented a room in the residence from her brother and his wife, the Judy and Keith Bierbaum.  See id.

24.     The officers located computer equipment in Daprano's bedroom and the dining room, letters with the Colorado Board of Parole's letterhead, documents from the AFCGC addressed to Gravina, documents from the NMEFCU regarding a vehicle loan, and several copies of a State of New Mexico District Court Name Change Petition to change the name Louis Anthony Daprano to Louis Anthony Gravina. See id. at 126:10-131:14 (Ross); EHE 14, Return and Inventory, dated June 11, 2004.  The name change petition contained the purported signature of the Honorable John J. Romero, Jr., Second Judicial District Court of New Mexico Judge.  See EHE 16, Name Change Petition, dated February 18, 2004.

-7-

25.     On June 11, 2004, at approximately 3:30 p.m., Ms. Johnston filed a Motion to Revoke Conditions of Release for Daprano.  See EHE 6, Motion to Revoke Conditions of Release, filed June 11, 2004.

26.     Judge McDonald set the hearing on the revocation motion on June 15, 2004, at 9 a.m. See EHE 9, The Honorable Louis P. McDonald Weekly Calendar: June 14, 2004-June 18, 2004.

27.     Rule 5-104C of the New Mexico Rules of Criminal Procedure for the District Courts states:

> A written motion, other than one which may be heard ex parte, and notice of the hearing thereon shall be served no later than five (5) days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court. Such an order may for cause shown be made on ex parte application.

N.M. R. Crim. P. Dist. Ct. 5-104C.

28.     Mr. Hernandez received notice of the hearing, and its date and time.  See May 25 Transcript at 103:11-22 (Hernandez); July 7 Transcript at 64:19-65:6 (Hernandez).

29.     Mr. Hernandez ordinarily called Daprano's cellular phone to contact him and provide him with notice and information concerning his case.  See May 25 Transcript at 97:23-98:4 (Hernandez).

30.     Mr. Hernandez called Daprano's cellular phone to notify him of the hearing set on June 15, 2004.  See July 7 Transcript at 65:7-66:10 (Hernandez); EHE 50, Louis A. Gravina T-Mobile Statements for May & June 2004;  EHE 52, Arthur Hernandez Verizon Statement for June 2004.

31.     On June 11, 2004, Daprano told the AFCGC that he had to go to the east coast to tend to his ill son and requested that he be given his paycheck early.  See July 5 Transcript at 226:6-

21 (Grau).  The AFCGC gave Daprano, who it knew as Gravina, an advance around 2:00 p.m. on June 11, 2004.  See id. at 273:11-274:17 (Davis).

32.     The AFCGC used the NMEFCU as its bank for staff payroll.  See id. at 274:18-20 (Davis).

33.     At approximately 5:30 p.m. on June 11, 2004, Nancy Grau, the executive director of the AFCGC, received a phone call from the AFCGC's security company informing her that the alarm had been triggered at the AFCGC.  See id. at 228:5-229:8 (Grau).  Grau went to the AFCGC and saw Daprano, whom she knew as Gravina, loading his belongings and supplies into his Jetta.  See id.

34.     On June 14, 2004, the AFCGC set about verifying the documents that Gravina had given it upon starting his employment there.  See id. at 242:13-21 (Grau).  The AFCGC found out that a letter that Daprano had presented it, purportedly from the New Mexico Department of Health, which stated that Gravina had been cleared and that there was no reason for him to be fingerprinted again, was fake.  See id. at 238:13:25; EHE 47, Letter from Jack Callighan to Louis Gravina, dated January 21, 2004.  The AFCGC also found out that Gravina had never attended or attained degrees from the University of California, Los Angeles, as he represented.  See July 5 Transcript at 242:13-21 (Grau).

35.     After determining that several of the documents that Gravina had provided were fraudulent, the AFCGC contacted the FBI, the New Mexico Board of Psychological Examiners, and the New Mexico Children, Youth and Families Department to inform them that Gravina did not possess the credentials he represented and that he was not the person that he appeared to be.  See July 5 Transcript at 239:5-22 (Grau).

36.     Mr. Hernandez formally sought to withdraw as Daprano's counsel on June 14, 2004.

See EHE 7, Motion to Withdraw as Counsel, filed June 14, 2004. Judge McDonald signed the order removing Mr. Hernandez as Daprano's counsel on June 25, 2004. See EHE 8, Order Allowing Withdrawal of Counsel and for Substitution of Counsel.

37.     Daprano did not appear at the hearing on the Motion to Revoke Conditions of Release, held at 9:00 a.m. on June 15, 2004. See EHE 10, Bench Warrant, filed June 15, 2004. Mr. Hernandez was present at the hearing. See July 5 Transcript at 55:21-56:8 (Hernandez). Based on the allegation that Daprano was in violation of the terms of his release, Judge McDonald issued a bench warrant for Daprano's arrest. Daprano was entered into the National Crime Information Center database as a wanted person. See EHE 10, Bench Warrant.

### C.     The June 16, 2004 Search Warrant for Daprano's Place of Employment, The AFCGC, 117 Montclaire, S.E., Albuquerque, New Mexico.

38.     On June 16, 2004, Nunez drafted and executed a search warrant for the AFCGC, Daprano's place of employment. See EHE 19, Affidavit for Search Warrant & Search Warrant, filed June 16, 2004; December 14 Transcript at 35:5-36:17 (Nunez).

39.     Nunez was advised that Daprano had gained employment as a staff therapist at the AFCGC on or about April 19, 2004, under the name Gravina. See id. at 33:9-37:25 (Nunez). Nunez was also advised that Daprano worked with juveniles, that he had not been at work since June 11, 2004, and that he had left many of his personal belongings in his office. See id. at 33:9-37:25 (Nunez); see id. at 62:2-12 (Nunez).

40.     Officers obtained Daprano's employment file, a computer, and numerous documents and books. See EHE 20, Return and Inventory, dated June 16, 2004; EHE 21, Rio Rancho Department of Public Safety Evidence and Property Record, dated June 16, 2004.

41.     The employment file contained numerous fraudulent documents in the name of Louis Anthony Gravina, including fraudulent university transcripts, certificates, and letters of reference. The file also contained a copy of a Social Security card in the name of Louis Anthony Gravina, a copy of a New Mexico Drivers License in the name of Louis A. Gravina, with a photograph of Daprano, a signed United States Department of Justice I-9 form in the name of Louis A. Gravina, and a United States Department of the Treasury W-4 form for Louis A. Gravina.   See EHE 59, AFCGC Employment File for Louis Anthony Gravina.

        **D.     The June 17, 2004 Subpoena Duces Tecum for the NMEFCU.**

42.     On June 17, 2004, Ross served a state Subpoena Duces Tecum on the NMEFCU in an effort to ascertain Daprano's whereabouts. See EHE 22, Subpoena Duces Tecum, dated June 17, 2004.

43.      Pursuant to the subpoena, the NMEFCU provided documents that revealed that Daprano had obtained two loans from the NMEFCU under the name Louis Anthony Gravina. Daprano had used the alias "Reverend Louis Anthony Gravina" and a fraudulent letter from Archbishop Michael J. Sheehan, Archbishop of Santa Fe, to obtain a vehicle loan for the Volkswagen Jetta and a computer loan.  See EHE 23, Letter from Archbishop Michael Sheehan  on Behalf of Louis Anthony Gravina, dated February 17, 2004; July 5 Transcript at 143:4-144:14 (Ross).

        **E.     The June 22, 2004 Arrest of Daprano in Wynantskill, New York.**

44.     On or about June 18, 2004, Ross contacted the Albuquerque office of the United States  Marshals to assist with the apprehension and execution of the outstanding arrest warrant for Daprano.  See May 25 Transcript at 115:10-116:5 (Daniels).  Deputy United States Marshal Chris Daniels initiated a federal fugitive investigation into Daprano, a.k.a. Gravina.  See id.

45.     Daniels determined that Daprano used the alias Gravina, and that he drove a black Volkswagen Jetta, New Mexico license plate number GGK 891, registered under the name Gravina. See EHE 27, Warrant Information Network Print Out, generated June 18, 2004; May 25 Transcript at 116:4-25 (Daniels).

46.     On June 22, 2004, the Albuquerque United States Marshals office contacted the United States Marshal Service in Albany, New York to relay that it believed that Daprano was in the Albany area. See May 25 Transcript at 18:8-20 (Sullivan).

47.     On the evening of June 22, 2004, the Capitol District Fugitive Task Force arrested Daprano at Villa Valente restaurant in Wynantskill, New York. See EHE 34, Albany Police Department Property Report, dated 7:56 p.m., June 22, 2004.

48.     Upon apprehension, Daprano was searched for weapons. Among the items on Daprano's person were two business cards with the name Louis A. Gravina. See EHE 32, Business Card of Louis A. Gravina; EHE 33, The AFCGC Business Card of Louis A. Gravina. One identified his place of employment as the AFCGC. See EHE 33, AFCGC Business Card of Louis A. Gravina.

49.     Deputy United States Marshal Neil Sullivan mailed the two business cards and a cell phone that Daprano had in his possession to Ross. See May 25 Transcript at 26:25-27:18 (Sullivan).

**F.     The Vehicle Inventory Search of the Black, 2001 Volkswagen Jetta, New Mexico License Plate GGK 891.**

50.     On June 23, 2004, Ross contacted North Greenbush Police Department Chief Rocco Fragomeni to notify him of Daprano's arrest at the Villa Valente restaurant and inquire about the whereabouts of Daprano's vehicle, the black 2001 Volkswagen Jetta. See May 25 Transcript at 71:12-74:9 (Fragomeni); EHE 36, New York State Incident Report, dated June 23, 2004.

51.     Fragomeni dispatched Officer David Keevern to the Villa Valente restaurant to locate the vehicle.  See May 25 Transcript at 74:12-18 (Fragomeni).

52.     After learning that the vehicle was in the restaurant parking lot, the owner of the restaurant requested that Keevern remove the vehicle.  See May 25 Transcript at 91:25-92:23 (Keevern).

53.      Pursuant to the North Greenbush Police Department Policy for Towing and Impoundment of Vehicles, Keevern had the vehicle towed to the North Greenbush Police Department where he conducted an inventory search of the vehicle.  See id. at 93:2-18 (Keevern); EHE 35, North Greenbush Police Department, Operations Procedure, Towing & Impoundment.  Because Keevern did not have a key to the vehicle, he used the "Big Easy Lockout Tool" through the sunroof, which was open, to gain entry to the vehicle.  See May 25 Transcript at 93:2-18 (Keevern).

54.     Keevern searched the vehicle and inventoried its contents.  See EHE 37, Vehicle Description Form, dated June 23, 2004; EHE 38, Vehicle Contents Inventory Form; EHE 40, Vehicle Impoundment and Inventory Diagram Form, dated June 23, 2004

**G.     The August 23, 2004 Search of the Black, 2001 Volkswagen Jetta, New Mexico License Plate GGK 891, Executed in the State of New York.**

55.     While Daprano was pending extradition to New Mexico, Nunez, with the assistance of Albany Police Department Officer Robert Wise, drafted a search warrant for Daprano's vehicle. See May 25 Transcript at 46:16-50:14 (Wise).

56.     The search warrant was based on several attached documents, including: (i) a notarized copy of the June 11, 2004 New Mexico Search Warrant for Daprano's residence; (ii) the June 15, 2004 New Mexico Bench Warrant for Daprano's arrest; (iii) the June 16, 2004 New Mexico

Search Warrant for the AFCGC; (iv) New Mexico Uniform Incident Report 01-1191; and (v) a copy of Daprano's Albany Police Department arrest record.  See EHE 42, State of New York Search Warrant, dated August 23, 2004.

57.     The search warrant does not contain an explanation of why the officers believed that the items listed in the warrant would be found in the vehicle.  See id.

58.     The only reason that the officers could assert that certain property was in the vehicle was because of the inventory search that the North Greenbush police conducted.  See id.

59.     An Albany County judge issued the warrant on August 23, 2004. See id.  The warrant was issued so that the property in the Jetta could be taken back to New Mexico with Daprano.  See May 25 Transcript at 46:16-50:14 (Wise).

60. The items seized from Daprano's vehicle pursuant to the search warrant were sent via express delivery from New York to New Mexico.  See EHE 44, Affidavit for Search Warrant, filed October 14, 2004.  On September 8, 2004, Nunez and Ross logged the evidence at the Rio Rancho Department of Public Safety evidence room.  See id.

## PROCEDURAL BACKGROUND

Daprano originally filed a motion to suppress challenging the search warrant that the State of New York issued.  See Suppression Motion at 1.  Specifically, Daprano requested that the Court suppress as evidence against him everything that was seized pursuant to the inventory search and the August 23, 2004 search in New York, and all evidence derived therefrom.  See id.  Even more specifically, Daprano requested that the Court suppress as evidence against him all of the items listed in the Return Receipt and Inventory of the search in Albany, New York.  See id. at 6.  Furthermore, Daprano requested that the Court dismiss those counts of the Indictment that may be based on the

evidence seized in Albany, or that were derived from that search.  See id.  Finally, Daprano asked the Court to conduct an evidentiary hearing.  See id.

After the United States filed its response to Daprano's original motion, he filed a reply, stating that the United States' response establishes that the Court should suppress, as a matter of law, all of the evidence seized pursuant to the June 11 search warrant for his residence.  See Defendant's Reply to Government's Answer to Defendant's Motion to Suppress at 1-2, filed April 1, 2005 (Doc. 35)("Reply").  Daprano contends that the June 11 search warrant was deficient, because it did not specify a nexus between the location and the crime to be investigated.  See id. at 2-3, 5-6. Additionally, Daprano requests that the Court suppress all additional evidence investigators have seized in the case -- whether by subpoena or other search warrant -- as fruit of the poisonous tree. See id. at 1-2, 10.

Daprano also filed, contemporaneously with his reply, an amended suppression motion.  The issues raised and addressed in the Amended Motion to Suppress are similar those contained in the reply.  See Amended Suppression Motion at 1-2, 10-11.

Daprano next filed an additional suppression motion.  In that motion, Daprano argues that the bench warrant for his arrest was invalid, because he did not receive notice of the June 15 hearing on the Motion to Revoke Conditions of Release that accorded with the Rules of Criminal Procedure for the District Courts of the State of New Mexico.  See Additional Suppression Motion at 2-3.  Based on that contention, Daprano argues further that all evidence seized pursuant to the arrest and subsequent searches -- the inventory search of his vehicle and the August 23 search warrant -- be suppressed.  See id. at 2-3.

At the conclusion of the fourth and final evidentiary hearing in this case, the Court requested,

and the parties submitted, closing memoranda summarizing and clarifying their positions.  In the Government's Closing Memorandum, the United States concedes that the June 11 search warrant for Daprano's residence, the June 16 search warrant for the AFCGC, and the August 23 search warrant for Daprano's vehicle were deficient because they lacked probable cause.  See Government's Closing Memorandum at 4-5, filed April 27, 2006 (Doc. 116).  In addition, the United States concedes that the good-faith exception to the warrant requirement does not apply to those search warrants, because they do not demonstrate a  nexus between probable cause and the location to be searched.  See id. at 5 n.2.

## LAW REGARDING THE FOURTH AMENDMENT

### 1.    Fourth Amendment Standing.

"A district court cannot suppress evidence unless the movant proves that a search implicates Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995).  To determine whether a particular defendant has standing to invoke the Fourth Amendment's protections, it is necessary to consider whether that defendant manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable.  See Smith v. Maryland, 442 U.S. 735, 740 (1979); United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000).  "A Defendant has standing to challenge a search only if he or she ha[d] a reasonable expectation of privacy in the area being searched."  United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996).  To decide whether a reasonable expectation of privacy existed, the court considers concepts of real or personal property law, keeping in mind that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."  Rakas v. Illinois, 439 U.S. 128, 143 & n.12 (1978).  While neither ownership nor lawful

possession are determinative, they are often dispositive factors; a defendant seeking to establish standing bears the burden of demonstrating "that he gained possession from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

A person who fails to come forward with any evidence establishing that they were in lawful possession of a vehicle does not have standing to contest a search of that vehicle. See United States v. Betancur, 24 F.3d 73, 77 (10th Cir. 1994). "[A] defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car," and, therefore, has no standing to contest a search of the car. United States v. Tropiano, 50 F.3d 157, 161-62 (2d Cir. 1995)("There is no dispute that the [defendant] knew the Cadillac was stolen. Accordingly, [the defendant] had no legitimate basis for possessing the Cadillac, and cannot now claim that he had a reasonable expectation of privacy in it.")(citing United States v. Betancur, 24 F.3d at 76-77). Analogizing the case of a stolen car to that of a fraudulently obtained laptop computer, with respect to Fourth Amendment standing, the United States Court of Appeals for the Ninth Circuit has held:

> The Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of the stolen property, such an expectation is not one that society is prepared to accept as reasonable. A legitimate expectation of privacy means more than a subjective expectation of not being discovered. . . . [A] person lacks a reasonable expectation of privacy in the contents of a laptop computer he stole. Similarly, several of our sister circuits have held that a person who steals a car does not have a reasonable expectation of privacy that entitles him to suppress what is found in the search of the stolen car. . . . We see no ground on which to distinguish property obtained by fraud from property that was stolen by robbery or trespass . . . A essential element of individual property is the legal right to exclude others from enjoying it, and it cannot be said that a thief has the right to exclude the true owner from the contents of property obtained by fraud.

United States v. Caymen, 404 F.3d 1196, 1200-01 (9th Cir. 2005)(citing United States v. Betancur,

24 F.3d at 76-77, and United States v. Tropiano, 50 F.3d at 161)(internal citations and quotations omitted).

## 2. **Facial Validity of a Search Warrant.**

To be valid, a search warrant must demonstrate probable cause. See U.S. Const. amend. IV. "Probable cause exists when the facts would lead a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." United States v. Reed, No. 05-5226, 2006 WL 3441532, at *5 (10th Cir. November 30, 2006)(internal citations and quotations omitted). Probable cause requires "more than mere suspicion but less evidence than is necessary to convict;" it also requires "a nexus between suspected criminal activity and the place to be searched." United States v. Danhauer, 229 F.3d 1002, 1005-06 (10th Cir. 2000). Probable cause, however, necessitates only the probability, and not a prima facie showing, of criminal activity. See United States v. Reed, 2006 WL 3441532, at *5.

In discussing affidavits presented in support of search warrants, the United States Court of Appeals for the Tenth Circuit has stated:

> An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(in determining whether an affidavit supports a finding of probable cause, we review the affidavit as a whole and look to the totality of the information contained therein). In making such determination, the magistrate may draw reasonable inferences from the material provided in the warrant application.

United States v. Reed, 2006 WL 3441532, at *5 (internal citations and quotations omitted).

### 3.    The Good-Faith Exception.

Based on the commands contained within the Fourth Amendment, the Supreme Court of the United States has created the exclusionary rule, "which prohibits the government from using evidence against an accused if such evidence was obtained through an illegal search or seizure." United States v. Reed, 2006 WL 3441532, at *8 (citing Weeks v. United States, 232 U.S. 383 (1914)). The exclusionary rule is "designed to deter police misconduct rather than to punish the errors of judges and magistrates" – "its application has been restricted to those instances where its remedial objectives are thought most efficaciously served;" accordingly, "where the exclusionary rule does not result in appreciable deterrence, its use is unwarranted." Id. (internal citations and quotations omitted)(citing Arizona v. Evans, 514 U.S. 1, 11 (1995), and United States v. Leon, 468 U.S. 897, 916 (1984)).

Applying those principles, the Supreme Court, in United States v. Leon, created an exception to the exclusionary rule. The Leon Court held that evidence seized pursuant to a neutral and detached magistrate's issuance of a warrant later found invalid may still be admissible if the executing officer acted in objective good faith and with reasonable reliance on the warrant. See United States v. Leon, 468 U.S. 905, 922-23. In determining whether the good-faith exception should apply, the Tenth Circuit has ruled:

> The good faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known the search was illegal despite the issuing judge's authorization. To answer this question, we must consider all of the circumstances and assume the executing officers have a reasonable knowledge of what the law prohibits.

United States v. Reed, 2006 WL 3441532, at *8 (internal citations and quotations omitted)(citing United States v. Corral-Corral, 899 F.2d 927, 931-32 (10th Cir. 1990)).

While evidence seized pursuant to a warrant should be suppressed only in unusual cases, in

-19-

United States v. Leon, the Supreme Court recognized four situations in which an officer would not

have reasonable grounds for believing that a search warrant was properly issued, and, thus, to which

the good-faith exception would not apply:

> (i) the issuing judge was misled by information in an affidavit that the affiant knew
> was false or would have known was false except for his reckless disregard for the
> truth; (ii) the issuing judge wholly abandoned his judicial role and failed to perform
> his neutral and detached role; (iii) the affidavit issued to support the warrant is so
> lacking in indicia of probable cause as to render official belief in its existence entirely
> unreasonable; and (iv) the warrant is so facially deficient that the executing officers
> cannot reasonably presume it to be valid.

United States v. Reed, 2006 WL 3441532, at *9 (citing United States v. Leon, 468 U.S. at 918,

923).  In such situations, the good-faith exception to the exclusionary rule does not apply and

suppression may be the appropriate remedy.

### 4.      The Independent-Source Doctrine.

The independent-source doctrine provides another exception to the exclusionary rule --

illegally seized evidence may be admitted if it was also lawfully obtained through an independent

source.  See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920); United States v.

Torres-Castro, No. 05-2357, 2006 WL 3598365, at *6 (10th Cir. December 12, 2006); United States

v. Eylicio-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995).  With regard to the rationale underlying

the independent source doctrine, the Supreme Court has stated:

> The interest of society in deterring unlawful police conduct and the public interest in
> having juries receive all probative evidence of a crime are properly balanced by
> putting the police in the same, not a worse, position that they would have been in if
> no police error or misconduct had occurred.  When the challenged evidence has an
> independent source, exclusion of such evidence would put the police in a worse
> position than they would have been in absent any error or violation.

Murray v. United States, 487 U.S. 533, 537 (1988)(internal citations and quotations omitted)(citing

Nix v. Williams, 467 U.S. 431, 443 (1984)).  The independent-source doctrine applies to evidence

initially discovered during, or derived from, an unlawful search, but later obtained independently from

activities the initial illegality has not tainted.  See Murray v. United States, 487 U.S. at 537.  In the

classic independent-source situation, information that was received through an illegal source is

considered to have been cleanly obtained when it arrives through an independent source.  See id. at

538-39 (citing United States v. Silvestri, 787 F.2d 736, 739 (1st Cir. 1986)).

Explaining the different ways in which it has employed the independent-source doctrine, the

Supreme Court, in Murray v. United States, stated:

> Our cases have used the concept of "independent source" in a more general and a
> more specific sense.  The more general sense identifies all evidence acquired in a
> fashion untainted by the illegal evidence-gathering activity.  Thus, where an unlawful
> entry has given investigators knowledge of facts x and y, but fact z has been learned
> by other means, fact z can be said to be admissible because derived from an
> "independent source."  This is how we used the term in Segura v. United States, 468
> U.S. 796 . . . (1984).  In that case, agents unlawfully entered the defendant's
> apartment and remained there until a search warrant was obtained.  The admissibility
> of what they discovered while waiting in the apartment was not before us, but we held
> that the evidence found for the first time during the execution of the valid and
> untainted search warrant was admissible because it was discovered pursuant to an
> "independent source" . . . .
>
> The original use of the term, however, and its more important use for
> purposes of these cases, was more specific.  It was originally applied in the
> exclusionary rule context, by Justice Holmes, with reference to that particular
> category of evidence acquired by an untainted search which is identical to the
> evidence unlawfully acquired -- that is, in the example just given, to knowledge of
> facts x and y derived from an independent source.

Murray v. United States, 487 U.S. at 537-38 (internal quotations omitted).  "The ultimate question

. . . is whether the [purportedly independent source] was in fact a genuinely independent source of

the information and tangible evidence at issue . . . .  Id. at 542 (stating that a source would not be

genuinely independent if what an officer saw during an invalid entry prompted the officer's decision

to seek a warrant, or if information obtained during the invalid entry was presented to the magistrate and affected his decision to issue the warrant); United States v. Griffin, 48 F.3d 1147, 1150 (10th Cir. 1995)(citing Hamilton v. Nix, 809 F.2d 463, 467 (8th Cir.)("The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct."), cert. denied, 483 U.S. 1023 (1987)).

### 5.    The Inevitable-Discovery Doctrine.

The inevitable-discovery doctrine also provides an exception to the exclusionary rule.  The doctrine permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986); see also United States v. Torres-Castro, 2006 WL 3598365 at *6.  "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).   The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct" – "it is possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997).  See United States v. Cunningham, 413 F.3d at 1204 n.1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham).  "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible."  United States v. Griffin, 48 F.3d at 1151 (internal citations and quotations omitted).

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53. The Owens court considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. Refusing to adopt the government position that the motel maids' routine cleaning of [the defendant's] room for the next occupant would have revealed the contraband, and that, therefore, the inevitable-discovery doctrine applied, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel's] staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel's] staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153.

### 6.    Inventory Searches.

The Fourth Amendment allows a police officer who has made a lawful custodial arrest of an occupant or recent occupant of a vehicle to search the passenger compartment of that vehicle as a contemporaneous incident of arrest. See Thornton v. United States, 541 U.S. 615, 617, 623-24 (2004); New York v. Belton, 453 U.S. 454, 460 (1981). A finding that an initial search of the passenger compartment was justified, however, does not extend to an inventory search of a

defendant's car.  See United States v. Pappas, 735 F.2d 1232, 1243 (10th Cir. 1984).  An inventory

search is justifiable only if law enforcement has the authority to impound the vehicle in question and

performs the search in accordance with explicit and comprehensive standardized procedures.  See

United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991).  An inventory search undertaken

pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the

warrant requirement."  Illinois v. Lafayette, 462 U.S. 640, 643 (1983).  Discussing the relationship

between probable cause and inventory searches in its opinion in United States v. Griffin, 729 F.2d 475

(7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has
> consistently sustained police intrusions into automobiles impounded or otherwise in
> lawful police custody where the process is aimed at securing or protecting the car and
> its contents.  Thus, the justification for an inventory search does not rest on probable
> cause and the absence of a warrant is immaterial to the reasonableness of the search.

729 F.2d at 481 (internal quotation marks and citations omitted)(quoting Illinois v. Lafayette, 462

U.S. at 643).  To determine the reasonableness of an inventory search, a court must balance the

search's intrusion on the Fourth Amendment right of the individual against legitimate government

interests, such as, protecting the owner's property while it remains in police custody, protecting the

police against claims or disputes over lost or stolen property, and protecting the police from potential

danger.  See South Dakota v. Opperman, 428 U.S. 364, 369 (1976); United States v. Griffin, 729

F.2d at 483.  Finally, where a vehicle is parked on private property and a person is available to take

custody of it, there is generally no need for impoundment, and, thus, no justification for an inventory

search.  See United States v. Pappas, 735 F.2d at 1243.

## ANALYSIS

Because the United States has conceded that the June 11, June 16, and August 23, 2004 search warrants lacked probable cause and were thus deficient, because the United States has also conceded that the good-faith exception does not apply to those warrants, and because the Court finds that Daprano lacks standing to contest the searches of the Jetta, the Court focuses its analysis on whether it should admit the numerous documents obtained from the NMEFCU and the AFCGC pursuant to the independent-source and inevitable-discovery doctrines, or suppress the evidence as fruit of the poisonous tree. The Court believes that the independent-source and inevitable-discovery doctrines save the otherwise illegally obtained evidence in question, and, therefore, will deny Daparano's suppression motions.

## I.    DAPRANO DOES NOT HAVE STANDING TO CHALLENGE EITHER THE INVENTORY SEARCH OR THE AUGUST 23, 2004 SEARCH OF THE JETTA.

Because there is no dispute that Daprano knowingly obtained the Jetta through fraud by securing a loan from the NMEFCU with the use of a false identity and a forged letter – the "Reverend Louis Anthony Gravina" and the fake letter from Archbishop Sheehan identifying that persona as a clergyman with a monthly salary at $2,000 – he has no legitimate expectation of privacy in the vehicle and, therefore, no standing to contest either the inventory search or the August 23, 2004 search of it.

In United States v. Betancur, the Tenth Circuit held that a person who fails to come forward with evidence establishing that he or she was in lawful possession of a vehicle does not have standing to contest a search of that vehicle. See 24 F.3d at 77. Other circuit courts, such as the United States Court of Appeals for the Second Circuit, have ruled, more specifically, that a defendant who

knowingly possesses a stolen vehicle has no legitimate expectation of privacy in the vehicle and, therefore, cannot establish standing to contest a search of the vehicle.  United States v. Tropiano, 50 F.3d at 161-62.  Basing its decision in United States v. Caymen on unlawful vehicle possession cases like Betancur and Tropiano, the Ninth Circuit, finding no ground on which to distinguish property obtained by fraud from property obtained by theft, found that a defendant who had fraudulently obtained a laptop computer had no Fourth Amendment standing to contest a search of that computer's files.  See United States v. Caymen, 404 F.3d at 1200-01.

Considering that line of cases, the Court finds that Daprano has no standing to contest the searches of the Jetta.  Like the Ninth Circuit, the Court does not believe that there is a basis for distinguishing between fraudulently obtained property and stolen property.  It is also clear to the Court that Darpano knowingly obtained the Jetta via fraudulent means.  As such, Daprano has no legitimate expectation of privacy in the Jetta and, therefore, has no standing to contest the searches of it.  Accordingly, to the extent that Daprano is requesting that the Court suppress evidence obtained from either the inventory search or the August 23 search, the Court will deny such requests.

## II.     PURSUANT TO THE INDEPENDENT-SOURCE AND INEVITABLE-DISCOVERY DOCTRINES, THE COURT WILL NOT SUPPRESS THE DOCUMENTS OBTAINED FROM THE NMEFCU AND THE AFCGC AS FRUIT OF THE POISONOUS TREE.

Given the United States' concessions regarding the facial invalidity of and inapplicability of the good-faith exception to the June 11 and June 16 search warrants, and that the United States has not argued that any exceptions to the exclusionary rule apply to the June 11 search, the Court must suppress the documentary evidence obtained from the NMEFCU and the AFCGC as fruit of the poisonous search of Daprano's residence, unless that evidence could also have been obtained through

an independent source or would have been inevitably discovered.  Because the Court believes that

the independent-source and inevitable-discovery doctrines save the otherwise illegally obtained

evidence  at issue here, it will not grant Daprano's suppression motions.

> **A.    THAT THE NMEFCU HELD THE LIEN ON DAPRANO'S JETTA WAS DETERMINED INDEPENDENT OF THE TAINTED JUNE 11, 2004 SEARCH OF 1120 SUMMIT AND WOULD HAVE INEVITABLY LED TO THE DISCOVERY OF THE FRAUDULENT DOCUMENTS HELD AT THE NMEFCU.**

Before the search warrant on Daprano's residence was executed, Nunez' surveillance of

Daprano provided Ross and Nunez with the knowledge that Daprano drove a black Volkswagen

Jetta, New Mexico license plate GGK 891.  That knowledge was obtained independent of the illegal

search on Daprano's residence.  Using that information, Ross and Nunez were able to determine that

the NMEFCU held the lien on the Jetta.  Equipped with that lienholder information, Ross eventually

obtained the fraudulent documents that the NMEFCU held via subpoena.   The Court does not

believe that the illegal search of 1120 Summit taints that independent source of evidence.

Even had Ross and Nunez combined the information obtained from their surveillance with

knowledge obtained at 1120 Summit, the independent knowledge of the Jetta that Ross and Nunez

had would inevitably have led them to discover that the NMEFCU held the lien on Daprano's vehicle.

The Court notes that discovery of the NMEFCU held lien would have been all the more likely given

the investigators' independent knowledge of Daprano's Gravina alias -- which the Thirteenth Judicial

District Attorney's Office had obtained both from a RMIN search and Paulsen.  Such knowledge

would have inevitably led them to request information concerning Daprano from the NMEFCU, as

they did in actuality, and, thus, they would have inevitably received the credit union documents at

issue.

The Tenth Circuit confronted similar situations in United States v. Griffin and United States v. Sloan, 17 Fed.Appx. 759 (10th Cir. 2001). In United States v. Griffin, the defendant argued that the evidence police obtained from her during an encounter that violated her Fifth Amendment rights and the evidence that police subsequently derived from that evidence should have been suppressed. See United States v. Griffin, 48 F.3d at 1148. Specifically, she contended that, because the police used telephone numbers from her pager and information from her statements obtained during the illegal encounter to identify and investigate the individuals who ultimately testified against her, the district court should have suppressed their testimony. See id. The United States countered that, before the illegal encounter, it had obtained information concerning the individuals who testified from an informant, entirely independent of the encounter with the defendant. See id. at 1149. Based on the independent source, the Tenth Circuit held that the testimony should not be suppressed, because, apart from the encounter, the testimony introduced against the defendant would have inevitably been discovered through independent legal means – "[w]hen combined with the . . . information the government independently acquired from [the informant], the ongoing investigations by the government would have resulted in the inevitable discovery of the witnesses who testified against the government." Id. at 1151.

In United States v. Sloan, the defendant appealed the decision of the district court not to suppress evidence, arguing that the district court should have suppressed contents of a storage shed, because officers learned of the existence of the shed from receipts the district court had previously suppressed. See United States v. Sloan, 17 Fed.Appx. at 763. Although the government discovered the storage shed from the receipts, it contended that it could have discovered the same information independently by interviewing a person who had witnessed the defendant visit the shed. See id. at

763-64.  Noting that the United States had come across the witness independent of the suppressed evidence, the Tenth Circuit ruled that "[t]he independent source rule and the inevitable discovery rule are ample reasons for affirming the district court in full."  Id. at 764.

Here, not unlike in Griffin and Sloan, investigators had knowledge from a source independent of the illegal search of Daprano's residence – the vehicle's description and plate number, and the Gravina alias from the RMIN search and Paulsen – that would have inevitably led to the discovery that the NMEFCU held the lien on the Jetta and that Daprano had used fraudulent documents to secure the vehicle loan from the NMEFCU.  The above considered, the Court finds that the fraudulent documents obtained from the NMEFCU should not be suppressed.

**B.     INDEPENDENTLY OBTAINED INFORMATION FROM THE UNITED STATES MARSHALS' INVESTIGATION AND ARREST OF DAPRANO WOULD HAVE INEVITABLY LED TO THE DISCOVERY OF THE FRAUDULENT DOCUMENTS AT THE NMEFCU AND AT THE AFCGC.**

Independent of the illegal searches of Daprano's residence and place of employment, Daniels discovered that Daprano used the alias Gravina and that a black Volkswagen Jetta, New Mexico license plate number GGK 891, was registered to Gravina.  That information, apart from any knowledge that may have been obtained from the June 11 and June 16 searches, would have inevitably led investigators to discover that the NMEFCU held the lien on the Jetta, which would have, in turn, inevitably led to the discovery of the fraudulent documents Daprano gave to the NMEFCU to obtain the loan for the vehicle.  Daniels testified that, had Daprano not been arrested when he was, he would have inquired with the NMEFCU regarding the lien.  See May 25 Transcript at 121:20-122:2 (Daniels).

Upon Daprano's arrest, Sullivan conducted a search of Daprano's person for weapons, which

-29-

has not been contested, and located two business cards, one of which identified Louis A. Gravina as a clinical psychologist working for the AFCGC.  Sullivan subsequently mailed that card to Ross.  The information on the Gravina-AFCGC business card, independent of the illegal June 11 and June 16 searches, provided investigators with the knowledge that Daprano worked at the AFCGC.  That knowledge would have inevitably led investigators to discover the fraudulent documents held at the AFCGC.

The knowledge of Daprano's alias and vehicle that Daniels discovered, and the business card that Sullivan recovered and sent to Ross, like the informant in United States v. Griffin and the witness in United States v. Sloan, were independent sources that would have inevitably led authorities to discover the fraudulent documents at the NMEFCU and the AFCGC.

Daprano contests those sources, arguing that they were discovered pursuant to an invalid bench warrant for his arrest, and that, therefore, they should be suppressed.  Daprano makes that contention based upon his claim that the June 15, 2004 hearing on the Motion to Revoke Conditions of Release did not comply with rule 5-104C of the New Mexico Rules of Criminal Procedure for the District Courts.  The Court, however, finds, based upon the plain language of rule 5-104C, the plain language of the Conditions of Release in effect on June 15, and the customary practice of the Thirteenth Judicial District Court of New Mexico, that the bench warrant was valid and, therefore, that the information the Marshals independently obtained need not be suppressed.

Rule 5-104C states:

A written motion, other than one which may be heard ex parte, and notice of the hearing thereon shall be served no later than five (5) days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court. Such an order may for cause shown be made on ex parte application.

N.M. R. Crim. P. Dist. Ct. 5-104C.  The plain language of the rule does not specify that motions  to

revoke conditions of release cannot be held ex parte or suggest that an order of the court altering the

timing of service can only be made upon a showing of cause by ex parte application.  The parties have

not provided, nor has the Court found, New Mexico case law interpreting the scope of rule 5-104C

or its relationship with the courts' inherent discretion. Rule 5-104C's language, when combined with

the provision in the January 14, 2004 Conditions of Release, which were in effect at the June 15

hearing, stating that "the Court may at any time modify or revoke the conditions of release imposed

by this order," EHE 3, Order Setting Conditions of Release, and the Thirteenth Judicial District

Court's customary practice of setting hearings without adherence to rule 5-104C requirements, see

May 25 Transcript at 18:21-23:8 (Johnston), id. 48:21-49:13 (Johnston), leads the Court to the

conclusion that the Thirteenth Judicial District Court was within its authority to hear the Motion to

Revoke Conditions of Release on less than five days notice.  The Court also notes that Johnston,

Hernandez, and Daprano had actual notice of the hearing.  As such, the Court finds that the bench

warrant for Daprano's arrest was not invalid and that, therefore, the Marshals' information need not

be put aside.

> ### C.   THE AFCGC'S INTERNAL INVESTIGATION OF THE DOCUMENTS DAPRANO GAVE IT WAS AN INDEPENDENT SOURCE THAT WOULD HAVE INEVITABLY LED TO INVESTIGATORS' DISCOVERY OF THE FRAUDULENT DOCUMENTS HELD AT THE AFCGC.

Independent of any law enforcement involvement, the AFCGC investigated several of the

documents Darpano gave it.  The AFCGC determined that many of those documents were fraudulent

and independently contacted the New Mexico Department of Health, the New Mexico Board of

Psychological Examiners, the New Mexico Children, Youth and Families Department, and the FBI

to alert those organizations to the fact the Gravina was not the person he purported to be.

In United States v. Larsen, the Tenth Circuit considered a defendant's appeal of the denial of his motion to suppress evidence discovered from bank records obtained via grand jury subpoena. See 127 F.3d at 985. The defendant argued that the evidence should be suppressed because it was derived from an illegal search and subsequent seizure -- state officers seized bank records, subpoenaed more records from the defendant's bank based upon those initially seized, and handed them over to the FBI to investigate. See id. at 985-86. The United States contended that a report by the defendant's bank, independently conducted without reference to the illegal police activity, would have been forwarded to the FDIC, which would have, in turn, forwarded it to the FBI to investigate, and that the evidence the FBI obtained through tracing the defendant's funds would have been inevitably discovered absent any illegality on the part of state authorities. See id. The Tenth Circuit held that the investigation that would have inevitably discovered the evidence did not need to be ongoing at the time of the constitutional violation, and affirmed that district court's conclusion that the defendant's bank's internal investigation was an independent source that would have inevitably led to the FBI's discovery of the evidence in question. See id. 986-97.

Similarly, in this case, the AFCGC, suspicious of Daprano after his quick and unusual departure, investigated several of the documents he had provided it. In doing so, the AFCGC contacted a number of entities, including the New Mexico Department of Health and the University of California, Los Angeles, and determined that many of the documents Daprano had given it were fraudulent. Possessing that information, the AFCGC contacted several state agencies and the FBI. FBI Special Agent Robert Georgi returned the AFCGC's telephone call. See Hearing Transcript at

5:3-6:2 (Georgi)(taken February 9, 2006).[3]  Georgi did not believe that he had enough information

to open a federal case, which Daprano highlights, but, as he testified, had he not spoken to Nunez,

who just happened to be executing the June 16 warrant when Georgi called the AFCGC, he would

have forwarded the information that the AFCGC shared with him to the Albuquerque Police

Department and/or the Bernalillo County Sheriff's Department.  See id. at 22:6-26:16 (Georgi).

Georgi testified that he ordinarily contacts local authorities when he believes that non-federal criminal

activity has taken place.  See id. at 22:13-17 (Georgi).  If Georgi had in fact contacted the

Albuquerque Police Department or the Bernalillo County Sheriff's Department, investigators would

have inevitably discovered the fraudulent documents at the AFCGC.  Those authorities would

inevitably have investigated the AFCGC's concerns and would have inevitably returned the

investigation to the FBI when they discovered that federal crimes were involved, as is routine and as

Ross and Nunez did when they contacted FBI Special Agent Charles Metzler.  See id. at 30:17-31:14

(Finzel & Metzler).  Thus, the Court finds that a source independent of any illegality, the AFCGC

independent investigation, would have inevitably led investigators to the fraudulent documents held

at the AFCGC.

Because the Court finds that Daprano does not have standing to challenge the inventory

search and the August 23, 2004 search of the Jetta, and because the Court finds that sources

independent of the illegal June 11, 2004 search of Daprano's residence and the illegal June 16, 2004

search of Daprano's place of employment would have inevitably led investigators to discover the

evidence in question, the Court will deny Daprano's motions to suppress.

---

[3] The Court's citations to the transcript of the February 9, 2006 hearing refer to the Court
Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or
line numbers.

The Court will not suppress the fraudulent documents from the NMEFCU and the AFCGC as fruit of the poisonous tree.

**IT IS ORDERED** that the Defendant Louis Anthony Daprano's Motion to Suppress, Defendant's Amended Motion to Suppress, and Defendant's Additional Motion to Suppress the Evidence of an Arrest Warrant Executed in the State of New York Against the Defendant, Louis Daprano, are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

David C. Iglesias
   United States Attorney for the
      District of New Mexico
Charles L. Barth
Amy Sirignano
   Assistant United States Attorneys
      for the District of New Mexico
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Roger A. Finzel
   Assistant Federal Public Defender
      Federal Public Defender's Office
Albuquerque, New Mexico

       *Attorney for the Defendant*