## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                      No. CR 04-2040 JB

LOUIS ANTHONY DAPRANO, a.k.a.
LOUIS ANTHONY GRAVINA

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Additional Motion to Dismiss, filed September 16, 2005 (Doc. 73)("Motion to Dismiss"). The Court held evidentiary hearings applicable to this motion on May 25, 2005, July 5, 2005, December 14, 2005, and February 9, 2006. The primary issue is whether the interaction of Defendant Louis Anthony Daprano's attorney with the state prosecutor violated Daprano's Fifth and Sixth Amendment rights in a fashion requiring dismissal of the federal indictment. Because the Court finds that Daprano's attorney did not provide ineffective assistance in a manner warranting dismissal of the indictment, and because the Court concludes that there is no reason to dismiss the indictment as a result of prosecutorial misconduct, the Court will deny Daprano's motion to dismiss.

## FINDINGS OF FACT

Rule 12(b) of the Federal Rules of Criminal Procedure provides: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). Rule 12(d) of the Federal Rules of Criminal Procedure requires

the Court to state its essential findings on the record when deciding a motion that involves factual

issues.  See United States v. Hall, 20 F.3d 1084, 1086 (10th Cir. 1994).  The findings of fact in this

Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule

12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of

Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence.  In deciding such preliminary questions, the rules of evidence, except those with respect to

privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider

hearsay in ruling on a pre-trial motion to dismiss an indictment.

      1.     Daprano was charged with Criminal Sexual Contact of a Minor, Third Degree, in

violation of N.M. Stat. § 30-9-13A, on March 27, 2003, in the Thirteenth Judicial District of New

Mexico.  See Evidentiary Hearing Exhibit ("EHE") 1, State of New Mexico Incident Report, dated

July 3, 2001; EHE 2, Affidavit for Arrest Warrant, dated July 6, 2001.

      2.     The Honorable Louis P. McDonald, District Judge for the Thirteenth Judicial District

of New Mexico, issued orders setting Daprano's conditions of release on April 24, 2003.  See EHE

4, Arraignment and Order Setting Conditions of Release, filed April 24, 2003; EHE 5, Conditions of

Release Order, filed September 15, 2003; EHE 3, Order Setting Conditions of Release, filed January

14, 2004.  In the January 14, 2004 order, the conditions were: Daprano will not leave Sandoval

County without state court permission; Daprano will keep his attorney informed of his whereabouts

and of any changes in address; Daprano's attorney will notify the court if Daprano is not at his normal

address and has absconded; Daprano will not have contact with the alleged victim or any

unsupervised contact with anyone less than eighteen years of age; and Daprano will not use drugs or

alcohol, and will not possess firearms.  See EHE 3, Order Setting Conditions of Release, filed January

14, 2004.

3.     The January 14, 2004 Order Setting Conditions of Release also stated: "The Court may at any time modify or revoke the conditions of release imposed by this order." Id.

4.     On May 18, 2004, before a state court hearing on Daprano's Motion to Dismiss, Daprano handed an unsigned fraudulent letter, dated May 7, 2004, purportedly from Allan Stanley, the Chairman of the Colorado Board of Parole, to his attorney, Mr. Arthur Hernandez. See EHE 11, Fraudulent Letter from Allan Stanley to Arthur Hernandez, dated May 7, 2004. Mr. Hernandez later received the same letter, which Allen Stanley purportedly signed, through the mail. See Hearing Transcript at 91:9-12 (Hernandez)(taken May 25, 2005)("May 25 Transcript").

5.     The fraudulent May 7, 2004 letter states that the Colorado charges assigned to Daprano were, in actuality, those of a relative who used Daprano's name, date of birth, and social security number to keep his own record clear. See EHE 11, Fraudulent Letter from Allan Stanley to Arthur Hernandez at 1, dated May 7, 2004. The letter also states that the relative marred Daprano's credit rating by taking out loans with Daprano's information and defaulting on them. See id. Further, the letter states that the Colorado Department of Corrections verified Daprano's education, degrees, and professional experience, finding that he has a valid doctorate in clinical psychology along with other degrees and certifications. See id.

6.     Mr. Hernandez made copies of the fraudulent letter to give to the prosecution and to the state court, and intended to introduce it at a May 18, 2005 hearing to bolster Daprano's argument. See May 25 Transcript at 92:6-11 (Hernandez).

7.     Mr. Hernandez gave a copy of the fraudulent letter to Thirteenth Judicial District Assistant District Attorney Cheryl Johnston before the May 18, 2005 hearing. See id. at 12:13-16

(Johnston).  Ms. Johnston was concerned about the letter's authenticity and moved for a continuance, which was granted, so that the letter could be verified.  See id. at 13:22-14:20 (Johnston).

8.      Ms. Johnston contacted the Colorado Attorney General's Office regarding the May 7, 2004 letter.  See id. at 14:21-24 (Johnston).  By June 4, 2004, she received both verbal and written confirmation, from Don Quick, with the Colorado Attorney General's Office, that the letter was fraudulent and forged.  See id. at 14:23-16:9 (Johnston).  Additionally, Deb Paulsen, from the Colorado Department of Corrections, informed Ms. Johnston that Daprano was living at 1120 Summit Drive, N.E., Albuquerque, New Mexico, and was using the alias Louis Anthony Gravina. See id. at 35:7-20 (Johnston); id. at 44:1-7 (Johnston).

9.      Stanley informed Mr. Hernandez via letter, dated May 27, 2004, that the May 7 letter he purportedly sent and signed was a forgery.  See EHE 12, Letter from Alan Stanley to Arthur Hernandez, dated May 27, 2004.  Mr. Hernandez received the letter after Ms. Johnston had been in communication with Colorado authorities concerning the letter; he never contacted the Colorado authorities regarding the May 7 letter directly.   See Hearing Transcript at 44:10-12 (Hernandez)(taken July 5, 2005)("July 5 Transcript").

10.     Ms. Johnston was faxed a courtesy copy of the letter Stanley had sent to Mr. Hernandez concerning the May 7 letter's fraudulent nature.  See May 25 Transcript at 14:23-16:9 (Johnston).

11.     After confirming with the Colorado authorities that the May 7 letter was fraudulent, Ms. Johnston decided that she needed to file a motion to review Daprano's conditions of release. See id. at 16:18-20 (Johnston).

12.     Around May 25, 2004, Mr. Hernandez determined that a conflict situation was

-4-

developing, because of the investigative questions he was being asked concerning the May 7 letter. See May 25 Transcript at 99:12-17 (Hernandez). Mr. Hernandez told Ms. Johnston that he was receiving calls from Colorado authorities concerning the May 7 letter, which she already knew they were investigating, that he felt there was a conflict, and that he was going to withdraw from the case. See id. at 118:15-19 (Hernandez); id. 128:12-24 (Hernandez). By June 9, 2004, Ms. Johnston understood that Mr. Hernandez had expressed to her that he felt he had a conflict of interest with Daprano. See id. at 55:4-10 (Johnston).

13.     On July 31, 2002, Jesus Sandoval, who was then an investigator for the Thirteenth Judicial District Attorney's Office, conducted a Rocky Mountain Information Network ("RMIN") search, which showed that Daprano used the alias Louis A. Gravina. See EHE 18, RMIN Display for Louis A. Daprano, dated July 31, 2002; Hearing Transcript at 23:8-24:16 (taken December 14, 2005)(Nunez)("December 14 Transcript").

14.     The Thirteenth Judicial District Attorney's Office knew that Daprano and Gravina were the same person before June 11, 2004. See May 25 Transcript at 35:7-20 (Johnston); December 14 Transcript at 23:8-24:16 (Nunez).

15.     Rio Rancho Department of Public Safety Detective John Ross, after speaking with Ms. Johnston on June 8 or June 9, 2004, initiated an investigation concerning the authenticity of the May 7 letter. See July 5 Transcript at 107:25-109:23 (Ross).

16.     On June 9, 2004, Mr. Hernandez spoke to Ms. Johnston about Daprano's conditions of release and the fraudulent letter. See May 25 Transcript at 51:18-53:20 (Johnston). Ms. Johnston told Mr. Hernandez that she possessed evidence that the letter Daprano gave him was fraudulent and that she needed to get Daprano back into the courtroom to review his conditions of release. See

16:20-24.  Mr. Hernandez, in an effort to demonstrate he remained in contact with Daprano, and therefore avoid revocation of Daprano's release, advised Ms. Johnston that he would be meeting with Daprano on June 11, 2004.  See May 25 Transcript at 101:9-18 (Hernandez).  Mr. Hernandez never told Ms. Johnston that he and Daprano were not in contact; until the evening of June 11, 2004, Mr. Hernandez was in regular contact with Daprano.  See July 5 Transcript at 68:22-70:5 (Hernandez).  Mr. Hernandez did not request that the police be present at his June 11, 2004 meeting with Daprano. See id. at 58:18-59:20 (Hernandez).

17.     On June 10, 2004, based on the fraudulent letter that Daprano had given Mr. Hernandez, Ross drafted an affidavit for a search of Daprano's residence, 1120 Summit Drive, N.E., Albuquerque, New Mexico.  See EHE 13, Affidavit for Search Warrant & Search Warrant, dated June 10, 2004.  That same day, Ross took the affidavit to Judge McDonald, who reviewed it and signed the warrant.  See id.; July 5 Transcript 112:15-113:23 (Ross).

18.     The affidavit for the search warrant did not specify a nexus between the address listed, 1120 Summit Drive, and the crime to be investigated.  See EHE 13, Affidavit for Search Warrant & Search Warrant, dated June 10, 2004.

19.     On Friday, June 11, 2004, at Mr. Hernandez' office, Mr. Hernandez informed Daprano that he was going to withdraw as his attorney, because the fraudulent letter had placed him in a compromising position.  See May 25 Transcript at 100:16-101:8 (Hernandez).

20.     At Ms. Johnston's direction, Felix Nunez, an investigator from the Thirteenth Judicial District Attorney's Office, was conducting surveillance on Mr. Hernandez' office on June 11, 2004. See December 14 Transcript at 24:17-25:11 (Nunez).  Nunez witnessed Daprano enter a black Volkswagen Jetta, license plate number GGK 891, in the parking lot of Mr. Hernandez' office.  See

id. at 50:10-14 (Nunez).  Nunez telephoned Ross and provided him with the license plate number.
See id. at 44:15-45:16 (Nunez).

21.     Ross checked the license plate number and learned that it was registered to Louis A.
Gravina, 1120 Summit Drive, N.E., Albuquerque, New Mexico, and that the New Mexico Educators
Federal Credit Union ("NMEFCU") held a lien on the vehicle.  See July 5 Transcript at 116:11-117:1
(Ross).  Ross verified that information with Barbara Alarid, the Director of Motor Vehicles for the
City of Rio Rancho.  See July 5 Transcript at 117:6-119:4 (Ross); July 5 Transcript at 90:21-25
(Alarid); EHE 24A, Motor Vehicle Division Owner Information, dated April 5, 2005; EHE 24B,
Motor Vehicle Division Lien Holder Form, dated April 5, 2005; EHE 24C, Motor Vehicle Division
Information Request, dated June 11, 2004.

22.     After obtaining the information concerning the Jetta that Nunez had seen Daprano
enter, Ross, with Nunez present, executed the search warrant on 1120 Summit Drive, at
approximately 11:00 a.m.  See July 5 Transcript at 120:11-121:22 (Ross).

23.     The mailbox in front of the residence at 1120 Summit Drive had the name "Gravina"
on it, as well as the names Judy and Keith Bierbaum, and Gregory Hollick.  See id. at 123:6-13
(Ross); EHE 25, Photograph of Mailbox at 1120 Summit Drive.

24.     Ross telephoned Daprano and asked Daprano if he would meet him and Nunez at
1120 Summit Drive regarding the fraudulent letter.  See July 5 Transcript at 160:12-161:21 (Ross).
Daprano stated that he would not meet Ross and Nunez; Daprano also refused to confirm his address.
See id.

25.     Marion Sheppard, the sister of the owner of the residence at 1120 Summit Drive,
arrived at 1120 Summit Drive on June 11, 2004, spoke with officer Ross, and unlocked the residence

so that the warrant could be executed.  See id. at 124:7-125:1 (Ross).

26.     Sheppard told the officers that Daprano rented a room in the residence from her brother and his wife, Judy and Keith Bierbaum.  See id.

27.     The officers located computer equipment in Daprano's bedroom and the dining room, letters with the Colorado Board of Parole's letterhead, documents from the Albuquerque Family Child Guidance Center addressed to Gravina, documents from the NMEFCU regarding a vehicle loan, and several copies of a State of New Mexico District Court Name Change Petition to change the name Louis Anthony Daprano to Louis Anthony Gravina.  See id. at 126:10-131:14 (Ross); EHE 14, Return and Inventory, dated June 11, 2004.  The name change petition contained the purported signature of the Honorable John J. Romero, Jr., Second Judicial District Court of New Mexico Judge.  See EHE 16, Name Change Petition, dated February 18, 2004.

28.     On June 11, 2004, at approximately 3:30 p.m., Ms. Johnston filed a Motion to Revoke Conditions of Release for Daprano.  See EHE 6, Motion to Revoke Conditions of Release, filed June 11, 2004.

29.     Judge McDonald set the hearing on the revocation motion on June 15, 2004, at 9:00 a.m.  See EHE 9, The Honorable Louis P. McDonald Weekly Calendar: June 14, 2004-June 18, 2004.

30.     Rule 5-104C of the New Mexico Rules of Criminal Procedure for the District Courts states:

> A written motion, other than one which may be heard ex parte, and notice of the hearing thereon shall be served no later than five (5) days before the time specified for the hearing, unless a different period is fixed by these rules or by order of the court. Such an order may for cause shown be made on ex parte application.

N.M. R. Crim. P. Dist. Ct. 5-104C.

31.     Mr. Hernandez received notice of the hearing, and its date and time.  See May 25 Transcript at 103:11-22 (Hernandez); July 5 Transcript at 64:19-65:6 (Hernandez).

32.     Mr. Hernandez ordinarily called Daprano's cellular phone to contact him and provide him with notice and information concerning his case.  See May 25 Transcript at 97:23-98:4 (Hernandez).

33.     Mr. Hernandez called Daprano's cellular phone to notify him of the hearing set on June 15, 2004.  See July 5 Transcript at 65:7-66:10 (Hernandez); EHE 50, Louis A. Gravina T-Mobile Statements for May & June 2004;  EHE 52, Arthur Hernandez Verizon Statement for June 2004.

34.     Mr. Hernandez formally sought to withdraw as Daprano's counsel on June 14, 2004.  See EHE 7, Motion to Withdraw as Counsel, filed June 14, 2004.  Judge McDonald signed the order removing Mr. Hernandez as Daprano's counsel on June 25, 2004.  See EHE 8, Order Allowing Withdrawal of Counsel and for Substitution of Counsel.

35.     Ms. Johnston understood that Mr. Hernandez was seeking to withdraw as Daprano's counsel, because Mr. Hernandez believed that Daprano's providing of a fraudulent letter for him to give to the Court had created a conflict of interest.  See May 25 Transcript at 27:24-28:1 (Johnston).

36.     In the Thirteenth Judicial District, when a motion to withdraw as counsel is filed, but the Court has not entered an order on the record, it is ordinary practice for the attorney that filed the motion to remain the attorney of record and continue representation until an order granting withdrawal is filed.  See May 25 Transcript at 71:8-15 (Johnston).

37.     Daprano did not appear at the hearing on the Motion to Revoke Conditions of

Release, held at 9:00 a.m. on June 15, 2004. <u>See</u> EHE 10, Bench Warrant, filed June 15, 2004. Mr. Hernandez was present at the hearing. <u>See</u> July 5 Transcript at 55:21-56:8 (Hernandez). Because Daprano did not attend the hearing, as his conditions of release required him to do, <u>see</u> EHE 3, Order Setting Conditions of Release, filed January 14, 2004, Mr. Hernandez did not believe that he had an argument worth putting before the state court and thus did not present an argument with respect to revocation of the conditions of release, <u>see</u> May 25 Transcript at 106:4-7 (Hernandez). Mr. Hernandez did not request that the hearing be continued. <u>See id.</u> at 129:24-130:5 (Hernandez). Based on the allegation that Daprano was in violation of the terms of his release, Judge McDonald issued a bench warrant for Daprano's arrest. Daprano was entered into the National Crime Information Center database as a wanted person. <u>See</u> EHE 10, Bench Warrant.

38.     Judge McDonald based the Bench Warrant on Daprano's failure to appear at the hearing on the motion to revoke conditions of release. <u>See</u> May 25 Transcript at 29:12-16 (Johnston).

39.     Mr. Hernandez was paid a flat fee of $500.00 for his representation of Mr. Daprano. <u>See</u> July 5 Transcript at 32:18-33:9 (Hernandez).

40.     The Rio Rancho Department of Public Safety's and the Thirteenth Judicial District Attorney's Office's investigation of the fraudulent May 7 letter uncovered evidence of the activities that form the basis of the indictment in this case, which was filed on October 14, 2004. <u>See</u> Indictment, filed October 14, 2004 (Doc. 4).

## **PROCEDURAL BACKGROUND**

Before Daprano filed his motion to dismiss, he filed three suppression motions: Defendant Louis Anthony Daprano's Motion to Suppress, filed February 18, 2005 (Doc. 20); Defendant's

-10-

Amended Motion to Suppress, filed April 6, 2005; and Defendant's Additional Motion to Suppress the Evidence of an Arrest Warrant Executed in the State of New York Against the Defendant, Louis Daprano, filed May 24, 2005 (Doc. 53).  After evidentiary hearings were held on those motions on May 25, 2005 and July 5, 2005, and based upon testimony given at those hearings, Daprano filed his motion to dismiss.  See Motion to Dismiss at 1.  Because the Court found that Daprano lacked standing to challenge the searches of his vehicle and that the independent and inevitable source doctrines applied to the documents seized from Daprano's place of employment and banking institution, the Court denied Daprano's suppression motions.  See Memorandum Opinion and Order, filed December 13, 2006 (Doc. 138).

In his motion to dismiss, Daprano contends that his Fifth and Sixth Amendment rights were violated in a manner requiring dismissal of the federal indictment.  See Motion to Dismiss at 1. Specifically, with regard to the Sixth Amendment, Daprano argues that Mr. Hernandez breached his duty of loyalty to him, thereby providing ineffective assistance of counsel, by giving a copy of the May 7 letter to Ms. Johnston at the May 18, 2004 hearing and by informing Ms. Johnston of the scheduled June 11, 2004 meeting between himself and Mr. Hernandez. See id. at 6-14.  With respect to the Fifth Amendment, Daprano argues that Ms. Johnston and her investigators exploited Mr. Hernandez' breaching of his duty of loyalty, thereby committing prosecutorial misconduct, by using their knowledge of the June 11, 2004 meeting to conduct surveillance on him.  See id. at 15-22. Daprano contends that, without information obtained solely from the investigation into the letter, which the surveillance conducted at Mr. Hernandez' office on June 11, 2004 aided, authorities would not have learned of the connection between Daprano and the alias Anthony Louis Gravina, and that without that connection the evidence leading to the federal indictment would not have been obtained.

See id. at 22.

## LAW REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court of the United States has long recognized that "the right to counsel is the right to effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that [it] cannot be relied upon as having produced a just result." Id. A defendant can pursue an ineffective assistance of counsel claim by asserting that the process was not adversarial because of affirmative state interference or a conflict of interest, or by arguing that his or her attorney was so inadequate that he or she was effectively denied the benefit of full adversarial testing. See Osborn v. Shillinger, 861 F.2d 612, 626 (10th Cir. 1988).

With regard to ineffective assistance arising from a conflict of interest, in Osborn v. Shillinger, the United States Court of Appeals for the Tenth Circuit stated:

> The most common means by which an attorney may fail to function as his client's advocate in the absence of affirmative state interference involves a conflict of interest arising from multiple or dual representation. An attorney may, however, abandon his "duty to loyalty" to his client through other sorts of conflicts as well. Whether the attorney is influenced by loyalties to other defendants, third parties, or the government, if he entirely fails to subject the prosecution . . . to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights.

861 F.2d at 625 (internal citations and quotations omitted). A defendant who demonstrates that a conflict of interest actually affected the adequacy of his representation does not need to show prejudice to obtain relief. See id. (citing Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980)). In such situations, prejudice will be presumed. The defendant must, however, "demonstrate[] that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Strickland v. Washington, 466 U.S. at 692. "[U]ntil a defendant shows that

-12-

his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."  Cuyler v. Sullivan, 446 U.S. at 350.

With respect to ineffective assistance arising from inadequate lawyering, Strickland v. Washington provides the applicable two-part test:

> First, the defendant must show that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair [proceeding] . . . .

Stickland v. Washington, 466 U.S. at 687.  See United States v. Kennedy, 225 F.3d 1187, 1197 (10th Cir. 2000).  The appropriate standard for attorney performance is that of reasonably effective assistance -- the defendant must demonstrate that counsel's representation, considering all the circumstances, fell below an objective standard of reasonableness based on prevailing professional norms.  See Strickland v. Washington, 466 U.S. at 687-88.  In evaluating an attorney's performance, the court must be highly deferential:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.
>
> * * * *
>
> At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.
>
> [C]hoices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on investigation.
In other words, counsel has a duty to make reasonable investigations or to make a
reasonable decision that makes particular investigations unnecessary.   In any
ineffectiveness case, a particular decision not to investigate must be directly assessed
for reasonableness in all the circumstances, applying a heavy measure of deference to
counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced
by the defendant's own statements or actions.  Counsel's actions are usually based,
quite properly, on informed strategic choices made by the defendant and on
information supplied by the defendant.  In particular, what investigation decisions are
reasonable depends critically on such information.  For example, when the facts that
support a certain potential line of defense are generally known to counsel because of
what the defendant has said, the need for further investigation may be considerably
diminished or eliminated altogether.  And when a defendant has given counsel reason
to believe that pursuing certain investigations would be fruitless or even harmful,
counsel's failure to pursue those investigations may not later be challenged as
unreasonable.

Stickland v. Washington, 466 U.S. at 689-91 (internal citations and quotations omitted).  See United

States v. Kennedy, 225 F.3d at 1197 ("There is a strong presumption that counsel provided effective

assistance, and a . . . defendant has the burden of proof to overcome that presumption.")(quoting

United States v. Williams, 948 F. Supp. 956, 960 (D. Kan. 1996)).

A defendant asserting ineffective assistance because of deficiency in attorney performance

must also affirmatively prove prejudice.  See Srickland v. Washington, 466 U.S. at 693; United States

v. Kennedy, 225 F.3d at 1197.  "The defendant must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland

v. Washington, 466 U.S. at 694.

The Sixth Amendment requires a remedy tailored to the injury suffered.  See United States

v. Rodgers, 751 F.2d 1074, 1078 (9th Cir. 1985)(citing United States v. Morrison, 449 U.S. 361, 364

-14-

(1981)).  In most ineffective assistance of counsel cases, suppression of the evidence, rather than dismissal of the indictment, is the appropriate remedy.  See United States v. Rodgers, 751 F.2d at 1078 (citing United States v. Morrison, 449 U.S. at 365-66, 366 n.3).  Dismissal is warranted, however, where there is continuing prejudice from a constitutional violation that suppression of the evidence cannot remedy.  See United States v. Rodgers, 751 F.2d at 1078 (citing United States v. Morrison, 449 U.S. at 365-66, 366 n.2).

## LAW REGARDING PROSECUTORIAL MISCONDUCT

A pre-indictment invasion of a defendant's attorney-client relationship can form the basis of a Fifth Amendment violation predicated upon prosecutorial misconduct.  See United States v. Kennedy, 225 F.3d at 1194; United States v. Mower, No. 2:02CR787, 2004 WL 2348067, at *2 (D. Utah October 15, 2004).  The conduct in question, however, must be so outrageous as to shock the conscience of the court.  See United States v. Kennedy, 225 F.3d at 1194 (citing Rochin v. California, 342 U.S. 165, 172-74 (1952)); United States v. Voigt, 89 F.3d 1050, 1065 (3d Cir. 1996)("[T]he judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause.").  In United States v. Kennedy, the Tenth Circuit adopted the test that the United States Court of Appeals for the Third Circuit had articulated in United States v. Voigt, 89 F.3d 1050 (3d 1996), for evaluating Fifth Amendment claims based on allegations of prosecutorial invasion of the attorney-client relationship.  See United States v. Kennedy, 225 F.3d at 1195.  The Voigt court had held:

> In order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate

intrusion into that relationship; and (3) actual and substantial prejudice.

United States v. Voigt, 89 F.3d at 1067.

In reaching its decision in United States v. Kennedy, the Tenth Circuit provided a summary of case law concerning the pre-indictment invasion of a defendant's attorney-client relationship:

> Other courts have concluded governmental misconduct in the form of a pre-indictment invasion of a defendant's attorney-client relationship may, under some circumstances, amount to a deprivation of the defendant's right to due process. See United States v. Schell, 775 F.2d 559, 562-63, 566 (4th Cir.1985) (holding defendants' due process rights were violated when their attorney represented them during grand jury proceedings, and then participated in their prosecution after indictments were issued in the same matter), cert. denied, 475 U.S. 1098, 106 S.Ct. 1498, 89 L.Ed.2d 898 (1986); United States v. Marshank, 777 F.Supp. 1507, 1521-23 (N.D.Cal.1991) (concluding pre-indictment intrusion into the attorney-client relationship was so pervasive and prejudicial as to warrant dismissal of the indictment where the defendant's attorney participated in the investigation of his client and the government knowingly assisted the attorney in violating the attorney-client privilege and hid the violation from the court). But see [United States v.] Rogers, 751 F.2d 1076, 1078-80 (holding defendants' former attorney breached his ethical duties to his former clients by divulging confidential information to the IRS during its pre-indictment investigation of the defendants, but concluding no prejudice to the defendants resulted justifying the dismissal of the indictment and the government engaged in no misconduct by interviewing the defendants' former attorney).

225 F.3d at 1195.

The appropriate remedy for a Fifth Amendment violation, like a Sixth Amendment violation, is generally suppression of the evidence. See United States v. Rodgers, 751 F.2d at 1078. Dismissal of the indictment for prosecutorial misconduct is appropriate, however, where there is continuing prejudice from a constitutional violation that suppression of the evidence cannot remedy. See id. (citing United States v. Morrison, 449 U.S. at 365-66, 366 n.2); 23A C.J.S. Criminal Law § 1683 ("The court has authority to dismiss an indictment. However, the sanction of dismissing an indictment is employed only in extreme cases of prosecutorial misconduct which is flagrant,

egregious, deliberate, longstanding, and which results in prejudice to the accused which is irremediable by less drastic means.").

## ANALYSIS

At the outset, the Court notes that Daprano does not allege ineffective assistance of counsel or prosecutorial misconduct with respect to his federal case; rather, he alleges that ineffective assistance and prosecutorial misconduct at the pre-trial stage of a state proceeding led to evidence that forms the basis of his federal indictment, and that, accordingly, that indictment should be dismissed. See Motion to Dismiss at 1, 22. It may be that Daprano cannot even maintain these claims in this federal case. The Court need not decide that legal issue, because even if Daprano can maintain these claims in this case, the Court finds that Daprano's attorney did not provide ineffective assistance warranting dismissal of the indictment, and the Court concludes that there is no reason to dismiss the indictment because of prosecutorial misconduct. Accordingly, the Court will deny the motion.

## I.   MR. HERNANDEZ' APPEARANCE ON DAPRANO'S BEHALF AT THE JUNE 15, 2004 HEARING WAS NOT IMPROPER.

Daprano's suggestion that Mr. Hernandez' appearance on his behalf at the June 15, 2004 hearing was improper, because Mr. Hernandez had filed a motion to withdraw as counsel on June 14, 2004, does not trouble the Court. See id. at 5. "An attorney who has appeared as the attorney of record in a cause cannot effectively terminate the relation by withdrawal until he or she has made application to the court and obtained leave to make a formal withdrawal of record," see 7A C.J.S. Attorney & Client § 270; "the attorney-client relationship ends when the court grants the attorney's motion to withdraw, and not on the date upon which the attorney decides to cease representing the

client," see id. § 271.  See, e.g., Anders v. California, 386 U.S. 738, 744 (1967); State ex rel. Children, Youth & Families Dep't v. David F., Sr., 121 N.M. 341, 345, 911 P.2d 235, 239 (Ct. App. 1995); State v. Hernandez, 104 N.M. 268, 270, 720 P.2d 303, 305 (Ct. App. 1986).  Moreover, in the Thirteenth Judicial District, as in many other districts, it is common practice for an attorney who filed a motion to withdraw as counsel to remain attorney of record and to represent his or her client until the court issues an order granting the requested withdrawal.  See May 25 Transcript at 71:8-15 (Johnston).  An order granting Mr. Hernandez' June 14, 2004 withdrawal motion was not filed until June 25, 2004.  Considering the foregoing, the Court concludes that Mr. Hernandez' appearance on behalf of Daprano at the June 15, 2004 was not improper and that such need not factor into its analysis of Daprano's ineffective-assistance-of-counsel claim.

## II.   DAPRANO'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM DOES NOT WARRANT DISMISSAL OF THE INDICTMENT.

Daprano's ineffective assistance claim is premised on his allegations that Mr. Hernandez breached the duty of loyalty and failed to avoid conflicts of interest, not allegations that Mr. Hernandez performed inadequately.  Specifically, Daprano argues that Mr. Hernandez breached his duty of loyalty by turning over the fraudulent May 7, 2004 letter to Ms. Johnston, disclosing to Ms. Johnston that Daprano was in violation of his conditions of release because he was failing to maintain contact with Mr. Hernandez, and informing Ms. Johnston of the scheduled June 11, 2004 meeting between Daprano and Mr. Hernandez.

With regard to Mr. Hernandez' providing of the May 7 letter to Ms. Johnston at the May 18, 2004 hearing, there is no indication that Mr. Hernandez' active representation of a conflicting interest led him to do that, or that his decision to do so resulted from an actual conflict of interest adversely

-18-

affecting his performance.  Daprano contends that Mr. Hernandez was actively representing his own interest, disclosing the letter to shield himself from any wrongdoing that may have been associated with Daprano's actions.  See Motion to Dismiss at 2-3, 9-10, 22.  Nothing in the record, however, supports that contention.  Instead, the record demonstrates that, on May 18, 2004, when Mr. Hernandez gave Ms. Johnston a copy of the May 7 letter, he did not believe himself to be in jeopardy of perpetrating a fraud upon the court and, in actuality, believed that he was representing Daprano's interest by preparing to submit to the court a letter that he had determined would bolster Daprano's position.  See May 25 Transcript at 92:6-11 (Hernandez).  There is no indication in the record that Mr. Hernandez was actively representing his own conflicting interest when he provided the May 7 letter to Ms. Johnston.  As such, the Court finds that Mr. Hernandez did not breach his duty of loyalty by giving Ms. Johnston a copy of the May 7 letter, and that, therefore, his providing of the letter does not support an assertion of a violation of the Sixth Amendment based upon ineffective assistance of counsel.

Concerning Daprano's contention that Mr. Hernandez disclosed to Ms. Johnston that Daprano was in violation of his conditions of release, because he had not maintained contact with Mr. Hernandez,  the record does not support that contention.  See Motion to Dismiss at 10.  Ms. Johnston's motion to revoke Daprano's conditions of release stated that Mr. Hernandez had not been in contract with Daprano for more than two weeks as of June 9, 2004.  See EHE 6, Motion to Revoke Conditions of Release, filed June 11, 2004.  When asked about that allegation at the May 25, 2005 hearing, Ms. Johnston stated that, after speaking with Mr. Hernandez, it was her understanding that Mr. Hernandez and Daprano had not been in weekly contact.  See May 25 Transcript at 25:4-16 (Johnston).  Ms. Johnston also stated that she "believed" Mr. Hernandez had told her that he and

Daprano had not been in contact, and that "[she] wouldn't have know that unless [Mr. Hernandez] told [her] that." Id. at 51:14-52:2 (Johnston). When Mr. Hernandez was asked whether he told Ms. Johnston that he and Daprano had not been in contact as the conditions of release required, Mr. Hernandez responded definitively that he had never told Ms. Johnston that he was not in contact with Daprano, that he was in contact with Daprano during the period in question, and that "[he] always tried to instill in [Ms. Johnston] that [he] was always in touch with [Daprano]." July 5 Transcript at 68:22-70:5 (Hernandez). Phone records also demonstrate that Daprano called Mr. Hernandez on May 19, 2004, May 20, 2004, May 25, 2004, May 28, 2004, June 9, 2004, June 10, 2004, and June 11, 2004. See EHE 50, T-Mobile Statements for Louis A. Gravina. Based upon the certainty with which Mr. Hernandez' testified and the phone records in the record, the Court finds that Mr. Hernandez did not tell Ms. Johnston that he and Daprano were not in contact. See July 5 Transcript at 68:22-70:5 (Hernandez). The Court also finds that Mr. Hernandez was in regular contact with Daprano until the night of June 11, 2004. See id. The Court, therefore, concludes that Mr. Hernandez did not violate his duty of loyalty by disclosing to Ms. Johnston that Daprano was in violation of his terms of release, and thus finds that the evidence does not support a claim of ineffective assistance of counsel in violation of the Sixth Amendment.

With respect to Daprano's contention that Mr. Hernandez breached his duty of loyalty by consenting to Ms. Johnston's request to have investigators present at the scheduled June 11, 2004 meeting between Mr. Hernandez and Daprano at Mr. Hernandez' office, see Motion to Dismiss at 7-8, evidence in the record does not support such a conclusion. For the Court to find that Mr. Hernandez provided ineffective assistance of counsel based on a breach of his duty of loyalty, Daprano must show that Mr. Hernandez actively represented a conflicting interest, in this case his

own, and that the actual conflict of interest adversely affected Mr. Hernandez' performance in support of Daprano's interest. See Strickland v. Washington, 466 U.S. at 692. While it is true that, by June 9, 2004, Mr. Hernandez had determined that a conflict of interest stemming from the Colorado authorities investigation into the May 7 letter had developed between he and Daprano, see May 25 Transcript at 99:12-17 (Hernandez), id. at 55:4-10 (Johnston), the record does not indicate that Mr. Hernandez consented to the government's surveillance of his June 11, 2004 meeting with Daprano. The record also does not indicate that Mr. Hernandez was actively representing his own interest when he informed Ms. Johnston on June 9, 2004 that he and Daprano were set to meet on June 11, 2004. Rather, the evidence supports a conclusion that Ms. Johnston never requested Mr. Hernandez' acquiescence regarding surveillance and that Mr. Hernandez was acting in Daprano's interest when he told Ms. Johnston of the meeting. See id. at 101:9-18 (Hernandez); July 5 Transcript at 58:18-59:20 (Hernandez); id. at 68:22-70:5 (Hernandez).

Mr. Hernandez informed Ms. Johnston that he had a meeting with Daprano scheduled on June 11, 2004 in an effort to forestall her move to revoke Daprano's conditions of release. See May 25 Transcript at 101:9-18 (Hernandez). Ms. Johnston had told Mr. Hernandez that she possessed evidence that the May 7 letter was fraudulent and that she needed to get Daprano before a judge to review his conditions of release. See id. at 16:20-24. Mr. Hernandez informed Ms. Johnston of the meeting to demonstrate that he was still in contact with Daprano in an attempt to prevent her from moving to revoke Daprano's conditions of release. See id. at 101:9-18. The Court finds, therefore, that Mr. Hernandez did not consent to a request by Ms. Johnston to conduct surveillance on Daprano and that Mr. Hernandez was not actively representing his own interest in a manner that adversely affected his performance on behalf of Daprano. The Court believes, instead, that Mr. Hernandez was

-21-

acting on behalf of Daprano's interest at the moment he informed Ms. Johnston, on June 9, 2004, about the June 11, 2004 meeting, and that any conflict of interest that may have existed did not adversely affect Mr. Hernandez' performance.  The Court concludes that Mr. Hernandez' informing Ms. Johnston of the June 11, 2004 meeting did not amount to an ineffective assistance of counsel based Sixth Amendment violation.

Because the Court finds that the actions Daprano alleges do not demonstrate that Mr. Hernandez was actively representing a conflicting interest and that an actual conflict of interest adversely affected Mr. Hernandez' performance, the Court will not dismiss the indictment on ineffective assistance grounds.

## III.    DAPRANO'S PROSECUTORIAL MISCONDUCT CLAIM DOES NOT WARRANT DISMISSAL OF THE INDICTMENT.

A pre-indictment invasion of the attorney-client relationship may amount to prosecutorial misconduct if the conduct in question is so outrageous as to shock the conscience of the court.  See United States v. Kennedy, 225 F.3d at 1194.  A colorable claim of outrageousness requires that the defendant demonstrate  that an issue of fact exists as to: (i) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (ii) deliberate intrusion into that relationship; and (iii) actual and substantial prejudice.  See id. at 1195 (citing United States v. Voigt, 89 F.3d at 1067).  Daprano alleges that Ms. Johnston committed prosecutorial misconduct by requesting that Mr. Hernandez allow the Thirteenth Judicial District Attorney's Office to conduct surveillance on a meeting between Mr. Hernandez and Daprano.  See Motion to Dismiss at 21.  The record shows, however, that rather than Ms. Johnston requesting that Mr. Hernandez consent to he and his client being monitored, Mr. Hernandez voluntarily informed Ms.

Johnston that he was scheduled to meet with Daprano at his office on June 11, 2004.  See May 25 Transcript at 101:9-18 (Hernandez).  As such, Daprano's allegations fail to demonstrate that a factual issue exists with respect to Ms. Johnston deliberately intruding into Mr. Hernandez' and Daprano's attorney-client relationship.  The Court notes that the record does not support the conclusion that Ms. Johnston or other persons from the Thirteenth Judicial District Attorney's Office sought confidential or privileged attorney-client information.  The record indicates only that the District Attorney's Office monitored Daprano entering his vehicle in Mr. Hernandez' office's parking lot, see December 14 Transcript at 50:10-14 (Nunez); the record also indicates that the District Attorney's Office did not seek to monitor any communications between Mr. Hernandez and Daprano, see id. at 24:17-25:11 (Nunez).

In his briefing, Daprano relies heavily on United States v. Marshank.  The Court believes, however, that this case and United States v. Marshank are distinguishable.  In United States v. Marshank, the district court ordered that the indictment be dismissed because of pervasive and prejudicial pre-indictment intrusion into the attorney-client relationship.  See 777 F. Supp. at 1530. There, Minkin, the attorney for two defendants cooperating with the government provided information to the government that led to the arrest and indictment of another one of his clients.  See id. at 1512-15.  Minkin then encouraged that client to cooperate with the government to secure an indictment against Marshank, with whom Minkin had an ongoing attorney-client relationship.  See id. at 1514-18.  Minkin also had a financial interest in Marshank's indictment.  The government had agreed to give a share of the proceeds from property seized from Marshank to the Minkin client providing information for Marshank's indictment.  See id.  Minkin, in turn, had negotiated a fee arrangement with that client whereby he would be paid a percentage of the sum the government

provided from Marshank's seized property.  See id.  After Marshank's arrest, Minkin told police that

they would have to be rougher with his client, Marshank, to get him to cooperate.  See id.  Minkin

also contacted Marshank's ex-wife in an effort to get her to pressure Marshank to cooperate with the

government.  See id.  In dismissing the indictment, the Marshank court held:

> [T]he government actively collaborated with Ron Minkin to build a case against the
> defendant, showing a complete lack of respect for the constitutional rights of the
> defendant and Minkin's other clients and an utter disregard for the government's
> ethical obligations . . . [T]he government colluded with Minkin to obtain an
> indictment against the defendant, to arrest the defendant, to ensure the Minkin would
> represent the defendant despite his obvious conflict of interest . . . .

United States v. Marshank, 777 F. Supp. at 1524.

In this case, unlike in United States v. Marshank, there is no evidence that the attorney, Mr.

Hernandez, was actively colluding with the government to investigate and prosecute his client,

Daprano.  Moreover, here there were no more than a few -- and possibly only one -- conversations

between Mr. Hernandez and Ms. Johnston concerning Daprano during the period from May 18, 2004

to June 9, 2004, see May 25 Transcript at 118:15-19 (Hernandez), id. at 128:12-24 (Hernandez), id.

at 51:18-53:20 (Johnston), and there is no indication in the record that Mr. Hernandez offered

information damaging to Daprano during his discussions with Ms. Johnston.  The long-term and

pervasive interaction that existed between the government and Minkin is not present here.  Further,

contrary to the situation that existed in United States v. Marshank, there is no indication that Mr.

Hernandez had a financial interest in cooperating with the state in its investigation of Daprano.

Additionally, the record here, unlike in United States v. Marshank, does not demonstrate that the

state was playing an active role in supporting defense counsel's active representation of conflicting

interests.  Here, by contrast, the evidence supports the conclusion that Mr. Hernandez informed Ms.

Johnston of the June 11, 2004 meeting in an effort to forestall the revocation of Daprano's conditions of release, see id. at 101:9-18, not that the state supported Mr. Hernandez acting in a manner adverse to Daprano's interests.

Considering the foregoing, the Court finds that Ms. Johnston's and the Thirteenth Judicial District Attorney's Office's conduct was not outrageous, let alone outrageous enough to shock the conscience of the Court.   As such, the Court concludes that Daprano's Fifth Amendment prosecutorial conduct claim does not warrant dismissal of the indictment.

Because the Court finds that Daprano's ineffective assistance of counsel and prosecutorial misconduct claims do not support dismissal of the indictment, it will deny Daprano's motion.

**IT IS ORDERED** that the Defendant's Additional Motion to Dismiss is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

David C. Iglesias
   United States Attorney for the
     District of New Mexico
Charles L. Barth
Amy Sirignano
   Assistant United States Attorneys
     for the District of New Mexico
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Roger A. Finzel
    Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

        *Attorney for the Defendant*